In re Bruce F. **LANGHOLF** and Julie Ann **Langholf,** Debtors.

**ROCK RIVER PRODUCTION CREDIT ASSOCIATION, Griffith Lumber and Grain Company, International Multifoods and Heckert Farm Supply,** Plaintiffs,

v.

Bruce F. **LANGHOLF** and Julie Ann **Langholf,** Defendants.

**Bankruptcy No. 82–B–00466.**
**Adv. No. 83–A–0238.**

United States Bankruptcy Court, N.D. Illinois, W.D.

Feb. 10, 1984.

Charles Beckman, Leslie Lamping, Dixon, Ill., Mary Gorman, Bradley T. Koch, Rockford, Ill., for plaintiffs.

Mark V. Anderson, Rockford, Ill., for defendants.

## MEMORANDUM OPINION

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This adversary proceeding comes before the Court on the Complaint of four creditors—Rock River Production Credit Association, represented by Attorney Charles Beckman, Griffith Lumber and Grain Company, represented by Attorney Bradley Koch, International Multifoods, represented by Attorney Mary P. Gorman, and Heckert Farm Supply, represented by Attorney Leslie Lamping—objecting to the discharge of the Chapter 7 Debtors, Bruce F. and Julie Ann Langholf, represented by Attorney Mark Anderson.

### FACTS

A series of admissions by the Debtors leaves us with the following fact pattern:

1. On May 21, 1982, the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. On February 28, 1983, the Debtors converted their Chapter 11 bankruptcy to a Chapter 7 liquidation.

416

3. From May 21, 1982, to February 28, 1983, the Debtors were Debtors-in-Possession and remained in possession of their property and conducted their farming business.

4. From May 21, 1982, to February 28, 1983, the Debtors rented certain farmland from Stan Griffith pursuant to a written lease agreement which required the Debtors to remit fifty percent of all proceeds derived from their farming operations to Griffith as rental.

5. On or about May 25, 1982, the Debtors established a Debtor-in-Possession bank account with the United Bank of Rochelle and deposited slightly over $19,000 in order to open this account.

6. On or about June 25, 1982, the Debtors received a check from Central Life Assurance Company for nearly $3,000, payable to the order of the husband/Debtor, "Bruce F. Langholf". This check was cashed by the Debtors but the Debtors did not deposit the check in their Debtor-in-Possession Account. Nor did they report its receipt in any monthly or semi-monthly report filed with the Court in their Chapter 11 case.

7. On or about November 6, 1982, the Debtors received a check for nearly $8,700 from Jack Peters as payment for the sale of 164 pigs. Remittance of fifty percent of the proceeds of this sale to their landlord, Stan Griffith, was not made by the Debtors until late April, 1983. (In addition, the testimony at trial of Stan Griffith revealed that he had no notice of this sale by the Debtors until the first meeting of creditors after the Debtors converted their case to Chapter 7 in April of 1983.) No mention of receipt of these proceeds was made by the Debtors in any monthly or semi-monthly report filed with the Court in their Chapter 11 case.

8. On or about June 7, 1982, the Debtors were issued a check for $2,000 by the United Bank of Rochelle. The Debtors cashed this check, but no related record of receipt or disbursement of the proceeds was made in any monthly or semi-monthly report filed with the court by the Debtors in their Chapter 11 case.

9. On the date on which the Debtors filed their Chapter 11 petition, they owed over $6,000 to the Kelley-Williamson Company, much of this amount being past due. Nonetheless, Kelley-Williamson Company was not listed as a creditor in the schedules filed by the Debtors in their Chapter 11 case.

10. On or about June 30, 1982, the Debtors tendered a check for nearly $2,000 to First Federal Savings & Loan Association of Dixon (First Federal). The Debtors received back almost $600 in cash from First Federal. This receipt of cash does not appear in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

11. On or about July 31, 1982, the Debtors tendered the sum of $960.56 to First Federal. Of this money, $622 was in the nature of a loan payment to First Federal, and $338.56 was converted to a money order payable to "Goodyear Service". Neither of these disbursements is reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

12. On or about August 19, 1982, the Debtors tendered a check for over $2500 to First Federal. From the proceeds of this check, money orders were issued payable to "Pineway Super Mart" ($81), "Country Mutual Insurance" ($828.49), and "Commonwealth Edison" ($784.62). These disbursements were not reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

13. On or about September 7, 1982, the Debtors received a $1900 check from the Griffith Family, endorsed it over to First Federal, and from the proceeds had money orders issued payable to "Franklin Mint" ($85) and "Sauk Valley College" ($250), neither of which was reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case. In addition, the Debtors received from these proceeds $834.20 in cash. No mention is made as to the receipt or disposition of this cash in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

14. On or about September 15, 1982, the Debtors received a $12,180 check from Jack Peters and endorsed it over to First Federal. From the proceeds of this check, the Debtors had money orders issued payable to the order of "Stan Griffith" ($6090), "First National Bank" ($1958.20), "Kelley-Williamson" ($2000), "Visa" ($150), "Montgomery Wards" ($208.61), "J.C. Penney" ($88.28), and "Commonwealth Edison" ($552.06). Further, the Debtors received back from First Federal $1132.85 in cash. None of these receipts or disbursements were reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

15. On or about September 26, 1982, the Debtors received a $12,600 check from Jack Peters. The Debtors endorsed the check over to First Federal and from the proceeds had money orders issued to, inter alia, "Stan Griffith" ($6300), "Stuart Tank Service" ($1900), and "James Miller", ($486). Also, the Debtors received back $2251.80 in cash from First Federal. These receipts and disbursements were not reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

16. On or about October 19, 1982, the Debtors received an $8,760 check from Jack Peters. The Debtors endorsed the check over to First Federal, and from the proceeds had money orders issued payable to, inter alia, "Stan Griffith" ($4,380). This disbursement is not reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case. From these proceeds, the Debtors received $2229.02 in cash, the receipt of which also went unreported.

17. On or about November 1, 1982, the Debtors received a $2966.83 check from Heinold Hog Market, Inc. The Debtors endorsed the check over to First Federal and from the proceeds had money orders issued payable to "Time/Life", ($28.42), and "Visa" ($100). These disbursements were not reported in any monthly or semi-month-

ly report filed by the Debtors in their Chapter 11 case.

18. On or about November 6, 1982, the Debtors received an $8692 check from Jack Peters and endorsed the check over to First Federal. From the proceeds the Debtors had money orders issued payable to, inter alia, "Franklin Mint" ($57.20), "Newsweek" ($19.50), "Zoobooks" ($9.95), and "Federal Life Insurance", ($243). The Debtors also received back $1489.52 in cash. These disbursements and the receipt and utilization of cash are not reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

19. On or about November 10, 1982, the Debtors received a $2179.80 check from Heinold Hog Market and endorsed the check over to First Federal. From the proceeds the Debtors disbursed a $653.10 loan payment to First Federal, which disbursement was not reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case. The Debtors also received from these proceeds $2179.80 in cash, the receipt and utilization of which was also not reported.

20. On or about November 26, 1982, the Debtors tendered a $7565.79 check to First Federal. From the proceeds, the Debtors had money orders issued payable to, inter alia, "Grolier Telemkgt" ($100), "Kelley-Williamson" ($1012.47), "Fleetwood" ($39), "Jesse Griffith" ($2800), and "Polo Motors" ($250.08). These disbursements were not reported in any monthly or semi-monthly report filed by the Debtors in their Chapter 11 case.

21. The Debtors did not utilize their Debtor-in-Possession Account during the months of August, September, October, and November 1982.

22. Also, during the pendency of their Chapter 11 case, the Debtors deposited various checks in their Debtor-in-Possession Account from which they received cash back as detailed below:

| Date | Source | Amount | Deposited | Cash |
|---|---|---|---|---|
| 5/25/82 | To Open Account | $19,727.21 | $19,727.21 | .00 |
| 6/06/82 | Jack Peters | $ 6,850.00 | $ 4,000.00 | $2,850.00 |
| 6/16/82 | Heinhold Hog Market | $ 2,971.77 | $ 1,821.77 | $1,150.00 |
| 7/20/83 | Heinhold Hog Market | $ 2,881.40 | $ 1,678.23 | $1,203.17 |
| 12/8/82 | Heinhold Hog Market | $ 3,110.20 | $ 3,010.20 | $ 100.00 |
| 1/04/83 | Heinhold Hog Market | $ 330.00 | $ 330.00 | $ .00 |
| 1/07/83 | Heinhold Hog Market | $ 400.00 | $ 400.00 | $ .00 |
| 1/10/83 | Heinhold Hog Market | $ 2,091.01 | $ 1,174.34 | $ 916.67 |
| 1/13/83 | Stan Griffith | $ 554.31 | $ 554.31 | $ .00 |
| 1/19/83 | # 2088 | $ 2,150.00 | $ 2,000.00 | $ 150.00 |
| 1/28/83 | GM/MG | $ 1,643.00 | | |
| | | $ 2,120.00 | $ 3,463.00 | $ 300.00 |
| 2/02/83 | Jack Peters | $ 4,743.50 | $ 4,500.50 | $ 243.00 |
| 2/04/83 | Heinhold Hog Market | $ 1,291.70 | $ 1,200.70 | $ 91.00 |
| 2/17/83 | Heinhold Hog Market | $ 6,835.79 | | |
| | | $ 1,500.00 | $ 6,756.61 | $1,579.18 |
| 2/22/83 | Jack Peters | $ 6,320.00 | $ 6,320.00 | $ .00 |
| | | | | $8,583.02 |

\* \* \*

## ANALYSIS

The Objection to Discharge is brought under Section 727, Subsections (a)(3), (a)(4) and (a)(5). The relevant portions are as follows:

Section 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any record information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all circumstances of the case.

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property or advantage, or a promise of money, property, or advantage for acting or forebearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

In this adversary proceeding the Court deals for the first time with an objection to the discharge of a Chapter 7 debtor based upon conduct occurring during the pendency of a Chapter 11 case prior to conversion to Chapter 7.

The Advisory Notes to Section 727 make clear that subsections (a)(3), (a)(4), and (a)(5) "center on the debtor's wrongdoing in or in connection with the bankruptcy case." In order to determine whether the actions of the Debtor upon which the Plaintiffs' Complaint is based took place "in or in connection with the bankruptcy case," the Court must look to the date upon which the Debtors' Chapter 7 case was commenced.

As Section 301 indicates, a voluntary bankruptcy case is deemed to be "commenced" by the Debtors upon their filing of a petition with the bankruptcy court. Section 301 further states that the commencement of a voluntary case under Title 11 constitutes an "order for relief".

Where a Chapter 11 case is converted to a case under Chapter 7, determination of the date of the "filing of the petition", the "commencement of the case" and the "order for relief" in the Chapter 7 case is made

pursuant to Section 348 of the Bankruptcy Code.

Section 348(a), entitled "Effect of Conversion", reads as follows:

"Conversion of a case from a case under one chapter of this title to a case under another chapter of this title constitutes an order for relief under the chapter to which the case is converted, but, except as provided in subsections (b) and (c) of this section, does not effect a change in the date of the filing of the petition, the cojmmencement of the case, or the order for relief."

In other words, subject to certain exceptions which are not applicable in this case, the filing of the petition, commencement of the case, and order for relief in a Chapter 7 case which has been converted from a case under Chapter 11 are all deemed to have occurred on the same date upon which those events occurred in the original Chapter 11 case.

Thus, the date upon which the Debtors here "commenced" their Chapter 7 case and the date upon which the "order for relief" in their Chapter 7 case was entered, are deemed by Section 348 to be May 21, 1982, the date upon which the Debtors filed their original Chapter 11 bankruptcy petition.

In addition, Bankruptcy Rule 1019, entitled "Conversion of Chapter 11 Reorganization Case or Chapter 13 Individual's Debt Adjustment Case to Chapter 7 Liquidation Case" states, inter alia, that when a Chapter 11 case is converted to a Chapter 7 case:

"(1) *Filing of Lists, Inventories, Schedules, Statements.* Lists, inventories, schedules, statements of financial affairs, and statements of executory contracts theretofore filed shall be deemed to be filed in the Chapter 7 case, unless the court directs otherwise."

The Court finds that all lists, inventories, schedules, and statements of financial affairs filed by the Debtors on and after May 21, 1982, the date upon which their Chapter 7 case has been deemed to have been commenced and an order for relief entered, are deemed to have been filed in the Debtors' Chapter 7 case. These filings and all the activities of the Debtors from the time they filed their original Chapter 11 petition are thus ripe for scrutiny in an analysis of the Plaintiffs' allegations that Sections 727(a)(3), (4) and (5) require this Court to deny discharge in the Debtors' Chapter 7 case.

■ Section 1141(d) provides in relevant part that:

(3) The confirmation of a plan does not discharge a debtor if—

(c) the debtor would be denied a discharge under Section 727(a) of this title if the case were a case under chapter 7 of this title.

It is apparent from the foregoing that where the Chapter 11 Debtors are individuals they must be aware of the dangers inherent in Section 727(a). Thus, individual Chapter 11 Debtors such as the Langholfs should know at the time they file a Chapter 11 case that their post-filing conduct could give rise to an Objection to Discharge under Section 727 in the Chapter 11 case or following conversion to Chapter 7.

\*　　\*　　\*

■ Following is the Court's review of the actions of the Debtors (as described at trial and as admitted by the Debtors during discovery) both before and after the date they filed their Chapter 11 petition, as these actions relate to the Creditors' Section 727(a)(3), (4) and (5) allegations.

As to Section 727(a)(5), the Court finds that the Debtors have fallen woefully short of explaining satisfactorily the loss and deficiency of assets to meet their liabilities. The Debtors had serious obligations as Debtors-in-Possession in a Chapter 11 case and as Chapter 7 Debtors, and their argument that as farmers they cannot be expected to possess the sophistication in business matters to meet these responsibilities is both unpersuasive and unmitigating.

Furthermore, the Court finds that the failure of the Debtors to list Kelley-Williamson as a creditor in their bankruptcy schedules was a knowing and fraudulent act constituting a false oath and account and as such is a basis for denial of discharge under

Section 727(a)(4) of the Bankruptcy Code. The Debtors had as a motive for this act the desire to continue making fuel purchases from Kelley-Williamson during the pendency of their Chapter 11 case. Testimony revealed that the Debtors had received within just a few weeks of filing their Chapter 11 petition an invoice detailing the debt which they owed Kelley-Williamson. Also, after becoming Chapter 11 Debtors-in-Possession, the Langholfs proceeded to arrange a private agreement with Kelley-Williamson providing for the retirement of the existing debt and the continuing sale of fuel to the Debtors.

The Court also finds that Section 727(a)(3) provides a basis for denial of the Debtors' discharge. The systematic failure of the Debtors to keep or preserve proper records from which their financial condition and business transactions could be ascertained is wholly unjustified under the circumstances of this case.

■ Moreover, the Court flatly rejects the Debtors' argument that because farmers are the "backbone of our country" they deserve some special consideration when they fail to meet their duties and obligations in a bankruptcy case. The Code in numerous instances makes provision for the unique needs and circumstances of farmers, demonstrating Congress' concern about the fate of farmers under the Bankruptcy Code. But there is no Code provision which exempts the vocation of farming from the duties and responsibilities imposed on Debtors in bankruptcy. It is a small price to pay for the rights and benefits available to a Debtor under Chapter 11.

Finally, it should be noted that the Debtors are not being punished for breaching their fiduciary duties as Debtors-in-Possession (although such breaches did occur), but rather for the fact that specific acts which they engaged in during their term as Debtors-in-Possession do not measure up under even the less stringent standards of Section 727.

Order entered accordingly.