In re Carroll B. GRIMES, Jr., Linda Nell Grimes, Grimes, Inc., d/b/a L & S Foods, Debtors.

CALCASIEU MARINE NATIONAL BANK OF LAKE CHARLES, Plaintiff,

v.

Carroll B. GRIMES, Jr., Linda Nell Grimes, Grimes, Inc. d/b/a L & S Foods, Defendants.

Charles N. WOOTEN, Trustee, Plaintiff,

v.

Carroll B. GRIMES, Jr., Linda Nell Grimes, Defendants.

Bankruptcy Nos. 483–00394–LC, 483–00395–LC.
Adv. Nos. 484–0248, 484–0238.

United States Bankruptcy Court, W.D. Louisiana.

Feb. 28, 1986.

Keith Rodriguez, Charles N. Wooten, Ltd., Lafayette, La., for trustee.

Scott J. Pias, Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill, Lake Charles, La., for Calcasieu Marine Nat. Bank.

Max M. Morris, Morris & Casey, Lake Charles, La., for debtors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RODNEY BERNARD, Jr., Bankruptcy Judge.

These matters came before the court for consolidated hearing on April 4, 1985. Appearing were Keith Rodriguez, Charles N. Wooten, Ltd., for trustee; Scott J. Pias, Camp, Carmouche, Barsh, Hunter, Gray, Hoffman and Gill, for Calcasieu Marine National Bank, and Max M. Morris, Morris and Casey, for debtors. After taking testimony in these cases, the court asked that the parties submit proposed findings and conclusions for the further consideration of the court. Defendants' brief was timely submitted. However, through mistake, the brief jointly prepared by the plaintiffs was not filed until September 27, 1984, although it was served on counsel for defendants some months earlier. There being no objection raised by counsel for defendants, this court has considered all the evidence and arguments presented, as if timely filed. The following shall constitute the findings and conclusions of this court.

### Facts

These two bankruptcy cases were originally filed in Chapter 11. The individual debtors were the sole stockholders in Grimes, Inc. The primary asset of Grimes, Inc. was a small grocery/convenience store. Mr. Grimes and/or Grimes, Inc. also owned certain heavy construction equipment, and with his son sub-contracted work laying water lines, working primarily on municipal projects.

Shortly after the filing of the petitions herein, plaintiff Calcasieu Marine National Bank was successful in having the automatic stay lifted and proceeded to foreclose on the debtors' home and the grocery store. Shortly thereafter, plaintiff Charles N. Wooten was appointed trustee in Chapter 11.

The debtors, when asked to produce the books and records of the grocery store, could produce little in the way of formal records. When asked at trial to identify where certain information might be found, neither of the individual debtors were able to do so. Further, they both testified that no inventory of the store had ever been taken. In addition, no cash register receipts had been kept to verify the entries in a daily journal. The debtors also testified that they took merchandise from the store, i.e. that they "lived out of" the store. Although Mrs. Grimes testified that records of those "draws" were kept, she was unable to identify the same in the records produced. Finally, the Grimes' accountant was unable to shed any light on the situation, because it was not he, but his son, who actually reconciled the books. Further, he testified that no audit was ever done. The little "accounting" work done was based exclusively on information provided by the Grimes.

After the stay was lifted, the grocery store was no longer an asset of the estate, so the debtor's construction business was

the debtors' only hope for reorganization. After meeting with representatives of the trustee, and discussing the debtors' duties in Chapter 11, Mr. Grimes informed Mr. Rodriguez, counsel for the trustee, that he had been offered two construction contracts in Texas. However, taking these jobs would entail removing the construction equipment liened to Calcasieu Marine National Bank from the jurisdiction of this court. After assurances that the debtor would keep the trustee apprised of his location, and would submit weekly reports of progress, and would conduct all financial business through the trustee, the trustee agreed to allow the debtors to complete two contracts in Texas, one in Freeport and one in Houston. Accordingly, the debtors took the heavy equipment (i.e. a backhoe, a dozer, and three trucks) to Texas.

Contrary to their agreement, the debtors never submitted weekly reports, and did not keep the trustee informed of where they were living. Mr. Grimes testified that he called Mr. Rodriguez, but that he could not be reached until after office hours, and his calls were not returned at such times. Additionally, Mr. Grimes made no attempt to contact the trustee by mail, and, as stated above, submitted no written reports of any kind. In fact, as was demonstrated at trial, Mr. Grimes kept no written records at all of his construction business from which weekly reports could have been compiled. Mr. and Mrs. Grimes testified that when Mr. Grimes received a progress payment, he would mail the check to Mrs. Grimes who then cashed the check, and after deducting what she needed for ordinary living expenses, would meet Mr. Grimes at a point halfway between Lake Charles and either Freeport or Houston, depending on where he was working, and turn over to him the remaining cash. Mr. Grimes would then pay the living expenses for himself and his son, and his trade creditors, in cash. Mr. Grimes received over $72,000.00 in this fashion and produced no records to account for any of it. Mr. Grimes testified that he was just breaking even, that there was no profit to turn over to the trustee. He did not dispute that his course of action contradicted the instructions from the trustee, and he admitted that he had no court order authorizing payment of living expenses out of assets of the estate. Mr. Grimes testified only that in the construction business it is impractical to do business as requested by the trustee, i.e., turning proceeds over to the trustee, with the trustee making all disbursements. While that may be true, Mr. Grimes offered no explanation as to why he agreed to that method in the first place.

Eventually the trustee located the equipment and had it seized. The estate did not benefit at all from the two construction jobs in Texas. After seizure of the equipment, this case was converted to one under Chapter 7. These two actions were there brought under 11 U.S.C. § 727 to deny the debtors' discharge. The complaints herein focus on two grounds for denial of discharge: Failure to keep or preserve books and records as required under Section 727(a)(3) and the making of a false oath as provided by Section 727(a)(4)(A). The allegations of Calcasieu Marine National Bank concern the failure to keep records relevant to the construction business. The trustee's complaint emphasizes that aspect as well, but is broad enough to encompass a similar failure to keep records relevant to the grocery store. That complaint also raises the issues of a false oath.

### Conclusions of Law

■ The discharge provisions of the Bankruptcy Code are meant to relieve an honest debtor of an intolerable burden of debt, and are therefore construed liberally in favor of the debtor and strictly against the objecting creditor. *In re Church,* 47 B.R. 186 (Bankr.E.D.Tenn.1985); *In re Epperson,* 45 B.R. 708 (Bankr.E.D.Tenn.1985); *In re Clemons,* 42 B.R. 796 (Bankr.S.D. Ohio 1984); *In re Cycle Accounting Services,* 43 B.R. 264 (Bankr.E.D.Tenn.1984); *In re Freeman,* 30 B.R. 704 (Bankr.W.D. La.1983); *In re Pierson,* 17 B.R. 822 (Bankr.D.Minn.1982); *In re Ciotta,* 4 B.R. 253 (Bankr.E.D.N.Y.1980). However, a debtor should not be allowed to benefit

from that liberal policy of discharge where he has ignored or deliberately violated provisions of the Code. *In re Greenwalt,* 48 B.R. 804 (D.Colo.1985); *In re Esposito,* 44 B.R. 817 (Bankr.S.D.N.Y.1984). The provisions of the Bankruptcy Code relevant to this action state as follows:

§ 727(a) The court shall grant the debtor a discharge unless

.    .    .    .    .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account;

.    .    .    .    .

The bulk of the evidence in this consolidated case, as outlined above, dealt with the debtors failure to keep adequate records in both the construction and grocery store businesses. As noted above, the debtors have minimal records from the grocery store, and none from the construction company. They have completely failed to provide a written accounting of over $72,-000.00 received by them in the course of the Chapter 11. For the reasons set forth below, this court finds that this failure to keep adequate records mandates denial of the debtors' discharge.

Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtors' financial condition and determine what has passed through a debtor's hands. *In re Esposito,* 44 B.R. 817 (Bankr. S.D.N.Y.1984). The creditors are entitled to written evidence of the debtor's financial situation and past transactions. *Broad National Bank v. Kadison,* 26 B.R. 1015 (D.N.J.1983). Maintenance of such records is a prerequisite to granting a discharge in bankruptcy, *Kadison, supra. See also In*

*re Borron,* 29 B.R. 122 (Bankr.W.D.Mo. 1983), unless the debtor justifies his failure to keep such records. *In re Ellison,* 34 B.R. 120 (Bankr.M.D.Ga.1983). The debtor's records do not have to be perfect, but must be kept in an "intelligent fashion". *In re Kottwitz,* 42 B.R. 566 (Bankr.W.D. Mo.1984). Those records must at least reasonably allow for reconstruction of the debtors financial condition to meet the requirements of the Bankruptcy Code. *In re Belk,* 44 B.R. 793 (Bankr.S.D.Fla.1984).

It is abundantly clear that the debtors in this case have failed to meet the requirements of the Code in this regard. Not only were the grocery store records produced unintelligible to the debtors, much less the creditors, but the debtors produced no records at all from the construction work in Texas. The plaintiffs produced evidence showing that the debtors received at least $72,000.00, and turned none of that over to the trustee. Such unexplained diminution of assets is exactly the evil Section 727(a)(3) is intended to redress.

It is also noteworthy that unlike the ordinary case of this kind, a large part of these debtors' failure to keep adequate records occurred during the pendency of a Chapter 11 proceeding. Therefore, the debtors had, if anything, a higher fiduciary duty to keep adequate records and preserve assets although these plaintiffs have chosen to sue under the less stringent standards of Section 727. The debtors here have not even attempted to meet those standards. *See In re Langholf,* 37 B.R. 414 (Bankr.N.D.Ill. 1984).

The final inquiry which must be made under Section 727(a)(3) is whether the debtors' complete failure to keep records is excused. As to records from the grocery store, the debtors simply assert their adequacy. However, neither of the debtors was able to answer specific questions about those records, or locate specific information. Nor could the witness presented, their accountant, enlighten the court in that regard. Finally, the debtors introduced no other evidence, such as the

records themselves, to demonstrate the adequacy of those records. As to the construction business, the only excuse offered was that all income from that business was eaten up by overhead, business expenses, and the debtors' personal living expenses. The court finds that totally inadequate to excuse a complete failure to keep books and records. First, it is equally important to keep records where no profit is generated, especially in a Chapter 11 proceeding. Second, Mr. Grimes admitted at trial that he was aware of his obligation to submit weekly reports, and that he had agreed to do so. That it was inconvenient to comply with that agreement is not an adequate excuse. Finally, the debtors' use of funds belonging to the estate for personal living expenses without prior court authorization, a violation of the provisions of the Code, cannot then be used to excuse a failure to keep records. Those provisions, like those requiring adequate record-keeping, are intended to enable the creditors to protect their rights. No attempt was made in this case to acquire court approval for these or any expenditures. These debtors carried on their businesses as they pleased, on a cash basis, with no consideration of the rights of creditors or the requirements of the Bankruptcy Code. Therefore, they are not entitled to the protection of the discharge provisions of the Code.

In addition, it is also alleged that Mr. Grimes made a false oath where, at the Section 341 meeting of creditors, he stated under oath that the jobs in Texas belonged to his son, Carroll Grimes, III, and that he was involved only as a consultant. Mr. Grimes retracted that statement at trial, saying "I would have said anything to save the store". The court thus finds that the jobs did, in fact, belong to the estate, not to Carroll Grimes, III. While it is clear that that was a false statement under oath, the foregoing decision on the issue of book-keeping makes it unnecessary to determine whether that false statement was willful and material so as to preclude discharge.

The debtors' discharge is denied. An appropriate judgment will be signed upon submission.