In re Kevin Patrick JACOBE, Debtor.

**HAYWOOD PROPERTIES, LTD., The Centre at Westgate, Ltd., Pinnacle Point Partners, Ltd., Intervenor, Plaintiffs,**

v.

**Kevin P. JACOBE, Defendant.**

**Bankruptcy No. 88–02650–RT.**
**Adv. No. 89–0155–RT.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Jan. 10, 1990.

Allan S. Buffenstein, William R. Baldwin, III, Hirschler, Fleischer, Weinberg Cox & Allen, Richmond Va., for Haywood Properties, Ltd. and The Centre At Westgate, Ltd.

Thomas Wolf, Mark B. Rhoads, Mezzullo, McCandlish & Framme, Richmond, Va., for Pinnacle Point Partners, Ltd., intervenor.

John G. Douglass, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, Va., for debtor/defendant.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy. Judge.

Haywood Properties, Ltd., The Centre at Westgate, Ltd., and other plaintiffs filed a complaint to deny the debtor's discharge pursuant to provisions of 11 U.S.C. § 727(a)(3), (5) and (7). Subsequently, Pinnacle Point Partners, Ltd., was allowed to intervene in the adversary proceeding as an additional plaintiff. Just prior to trial several of the original plaintiffs were allowed to withdraw, and the only plaintiffs remaining are those named above.

In accordance with the Court's findings and conclusions stated in this opinion, judgment will be entered for the defendant.

### Findings Of Fact

The defendant, Kevin P. Jacobe ("Jacobe"), filed his chapter 7 bankruptcy petition on December 1, 1988. At the time of filing his petition Jacobe was an officer (President), director and shareholder of Southeast Stores, Inc. ("Southeast"). On that date also Southeast was a debtor in possession in a chapter 11 bankruptcy case which had been filed in this Court on September 16, 1988 (Case No. 88–02202–RT).[1] Subsequently, Southeast's chapter 11 case was converted to a case under chapter 7 on February 23, 1989.

It is because of Jacobe's role in the business operations of Southeast and its predecessor corporations that the plaintiffs seek to deny his chapter 7 discharge. Jacobe was a founder of these corporations, and it is undisputed that he was an insider as that term is defined in 11 U.S.C. § 101(30)(A)(iv) and used in 11 U.S.C. § 727(a)(7).

Southeast was formed on January 29, 1988, through the merger of Atlantis International N.A. Inc., of Virginia (incorporated on February 5, 1987), Atlantis International N.A., Inc., of North Carolina (incorporated on June 29, 1987) and Family Choice Store, Inc. (incorporated on November 24, 1987). The company operated specialty retail apparel stores in the southeastern United States with headquarters located in Richmond, Virginia.[2]

In its store operations, Southeast as tenant entered into leases of shopping center stores, including leases with the plaintiffs in this adversary proceeding. The plaintiffs were Southeast's landlords in locations covered by their leases.

Most, if not all, of Southeast's store leases provided for the landlords to pay money to Southeast as an inducement for entering the leases.

The following three lease extracts are typical examples of these payment provisions:

(Example 1) B. *Build–Out Allowance:* Addition to Exhibit C of the "Lease":

Landlord will contribute and pay to Tenant SIXTY NINE THOUSAND EIGHT HUNDRED SIXTY FOUR DOLLARS AND NO CENTS ($69,864.00) to be used for finish work to be completed by Tenant. This contribution shall be drawn as follows:

1. Jacobe filed his chapter 7 petition after this Court denied a motion to extend to his benefit the automatic stay provided by 11 U.S.C. § 362 upon Southeast's filing a chapter 11 petition. In the motion, it was asserted that Southeast would be adversely affected if its essential management officer, Jacobe, was required to defend collection actions against him arising out of his guaranties of Southeast's store leases. In denying this motion this Court refused to extend to

Jacobe's situation the holding in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). *See Credit Alliance Corp. v. Williams*, 851 F.2d 119 (4th Cir.1988).

2. Reference in this opinion to Southeast includes reference to the predecessor corporations.

25%—upon Tenant's delivery of building permit to Landlord and Tenant's commencement of the construction of the Tenant finish.

25%—upon completion of ⅓ of the Tenant finish on the leased premises.

25%—upon completion of ⅔ of the Tenant finish on the leased premises.

25%—upon total completion of the Tenant finish on the leased premises. Tenant shall be open for business. Tenant shall deliver lien waivers from contractors. Tenant shall deliver Use and Occupancy Certificates. Tenant shall provide Proof of Insurance as required by the Lease.

(Addendum I to Lease Agreement dated December 21, 1987, between Pinnacle Point Partners, Ltd. and Atlantis International N.A., Inc. D/B/A Fashion Price. Pinnacle Point Exhibit 1.)

(Example 2) A. *Landlord's Contribution to Construction of the Leased Premises*

Provided Tenant is not in default of this lease, in addition to providing construction as outlined in Exhibit "B" attached herewith, the Landlord will contribute the additional construction improvements as outlined in plans submitted to Landlord and noticed as Exhibit B2 and pay to Tenant $23.00 (Twenty-three dollars) per square foot totaling $110,101.00 (One Hundred Ten Thousand One Hundred One dollars and 00/100) for Tenant's furniture, fixtures and equipment.

Such contribution shall be paid as follows:

25% on delivery of tenant's building permits to Landlord, and receipt of tenants plans for its construction improvements, and the placement of its furniture, fixtures and equipment.

25% on ½ completion of construction;

25% on completion of construction;

25% on opening of business.* (See below)

* Upon the payment of the last construction draw, Tenant agrees to pay three months prepaid rent.

(Addendum to Lease dated December 20, 1987, between Bennett v. York Developments and Atlantis International. Plaintiffs' Exhibit 1.)

(Example 3)

LEASE ACQUISITION COST

In consideration of Tenant entering into this Lease with Landlord, Landlord agrees to give Tenant $202,800.00 paid as follows:

15% paid to tenant when permits are obtained;

20% paid to tenant upon ⅓ completion;

30% paid to tenant upon ⅔ completion;

35% paid to tenant when open for business.

(Rider I to leases dated September 14, 1987, between The Centre at Westgate, Ltd. and Atlantis International, N.A. Plaintiffs' Exhibit 7.) Except for the amount of payment provided,. this rider is identical to that in another lease from this same landlord dated September 14, 1987, and to riders in two leases, both dated September 8, 1987, from Haywood Properties, Ltd. (Plaintiffs' Exhibits 6, 10, 11.)[3]

During 1987 and 1988 prior to filing its petition in bankruptcy, Southeast had

---

3. The original form of riders to these four leases provided as follows:

*Landlord's contribution to construction of the leased premises.* In addition to providing construction as outlined in Exhibit "B" attached herewith, the Landlord will contribute and pay to Tenant $26.00 per square foot, totaling $_____ for finish work to be done by the tenant. The contribution will be drawn as follows:

15% paid to tenant when permits are obtained;

20% paid to tenant upon ⅓ completion;
30% paid to tenant upon ⅔ completion;
35% paid to tenant when open for business.

Tenant shall supply invoices, bills, statements, or copies thereof to Landlord totaling $_____ to show Landlord where the above mentioned monies were spent on Tenant improvements in the above premises.

(Plaintiffs' Exhibits 6, 7, 10, 11.) The substitution of these lease riders was made at the request of a representative of the landlords.

opened more than 100 stores and had received in excess of $7,000,000.00 from landlords under lease provisions such as those set out above. It was the position of Southeast management, including Jacobe, that these "fit up" or "start up" payments from landlords were unrestricted and could be used by Southeast for any business purpose of the company.

On April 1, 1987, Southeast employed Kim O. Boys ("Boys"), a certified public accountant, who set up an accounting department and established a system of accounting for the company.

In accordance with management policy concerning the use of landlord start up funds, Southeast maintained no separate accounting files which reflected for each store lease the landlord's start up payment received or amounts expended by the company in preparation for the opening of the store. However, all such revenues and expenditures were accounted for in the overall accounting records of the company. At all times Southeast had available in its combined vendor accounting files information on all expenditures, including amounts expended in the opening of new stores. Additionally, payments received from landlords for start up expenses were accounted for in the general revenues of the company.

As stated above, Southeast's initial bookkeeping system did not break down landlord revenue and store start up expense information by individual locations. The corporation's accountant, Boys, believed that Southeast should maintain individual files which would reflect the amounts expended in start up of each store. Unknown to Southeast management, Boys compiled this type of information for the approximately thirty stores the company opened in 1987. (Exhibit A 2.) He did not compile individual expense figures for stores opened in 1988 because he felt this information was readily accessible under the accounting system developed for transactions after 1987.

For almost the entire existence of Southeast and its predecessors, corporate management had sought to raise capital for the store operations. Boys urged management to retain a recognized accounting firm to examine the company's books so that Southeast could present audited financial statements for presentation to potential investors or lenders. For this purpose, in late 1987 or early 1988, arrangements were made for Peat Marwick Main & Co. ("Peat Marwick"), a "Big Six" accounting firm, to examine the company's books.

While an examination was conducted by accountants of Peat Marwick during February and March, 1988, the firm never issued a formal audit or opinion with respect to the examination. Although no audit was completed, Peat Marwick did issue two draft reports of its findings, along with a draft management letter. (Pinnacle Point Exhibits 7, 8, 11.)

Peat Marwick's draft reports, dated January 30, 1988, reveal Southeast's serious financial position and express concern for the company's ability to continue in business.[4]

Peat Marwick's draft management letter is dated April 20, 1988, and contains a number of comments aimed primarily at improving Southeast's accounting system and cash controls. The following statement is made concerning the absence of individual store start up cost records:

### LEASEHOLD IMPROVEMENTS

The Company did not keep detail records of specific items that were capitalized as leasehold improvements and other fixed assets. In order to provide for accurate capitalization and amortization of fixed assets, we recommend that the Company establish a record keeping system that would accumulate the necessary information to properly record leasehold improvements and other fixed assets by store.

(Pinnacle Point Exhibit 11.)

Although the Peat Marwick draft reports and management letter reveal problems

---

4. For the approximate one year period ending January 30, 1988, Southeast incurred a net loss of $2,094,179.00. On that date current liabilities exceeded current assets by $210,848.00, and total liabilities exceeded total assets by $2,090,749.00.

with Southeast's accounting system, it has been established by the trial record that Southeast's books and records were capable of being audited. Moreover, the Court finds that the information on individual store start up expenses and landlord revenues is contained in the books and records of the company. With some degree of effort, the financial records of the company could produce accounts for individual stores reflecting this information.

There is no evidence that Southeast management intentionally sought to bury this individual store information in an attempt to deceive creditors. Rather the accounting treatment merely reflects management's policy that landlord revenues were general revenues of the company. The plaintiff's evidence has not established that this policy was contrary to the intent of the leases.

### Discussion And Conclusion Of Law

The plaintiffs seek to deny the debtor's discharge in bankruptcy which is provided for under 11 U.S.C. § 727. The statute and the exceptions relied upon by the plaintiffs state as follows:

§ 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

\* \* \* \* \* \*

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

\* \* \* \* \* \*

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, considering an insider;

\* \* \* \* \* \*

11 U.S.C. § 727(a) (1988).

Section 727(a)(7) effectively provides that an individual chapter 7 debtor's discharge may be denied if the individual committed acts prohibited by § 727 as an insider of a debtor in another bankruptcy case. As the Court has determined previously, it is uncontested here that Jacobe was an insider of Southeast Stores and its predecessors within the meaning of § 727(a)(7). Thus, his discharge must be denied if the Court determines that within one year of filing his petition Jacobe in his capacity as an insider of the corporations committed acts proscribed under §§ 727(a)(3) or (5). This is the basis of the plaintiffs' case here.

Bankruptcy Rule 4005 provides that the burden of proof rests with the plaintiffs to prove their case against Jacobe. Bankr.R. 4005. However neither the Bankruptcy Code nor the Bankruptcy Rules state the appropriate standard of proof required for a plaintiff to establish an exception to discharge. The Fourth Circuit Court of Appeals has ruled that the standard of proof for a complaint to determine the dischargeability of a debt under 11 U.S.C. § 523 is a preponderance of the evidence. *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir.1988). This Court follows the reasoning in *Combs* and finds that the standard of proof for a complaint to except a debtor from discharge under 11 U.S.C. § 727 is also a preponderance of the evidence. *See Green Hill Corp. v. Kim (In re Kim)*, 97 B.R. 275, 281 (Bankr.E.D.Va. 1989); *Second National Bank v. Parker (In re Parker)*, 85 B.R. 384, 387 (Bankr.E. D.Va.1988).

Section 727(a)(3).

The Court notes that § 727(a)(3) "is intended to allow creditors and/or the trustee to examine [a] debtor's financial condition and to determine what has passed

through a debtor's hands." *Dominick & Dominick v. Baxter (In re Baxter)*, 96 B.R. 58, 60 (Bankr.E.D.Va.1989) (quoting *In re Grimes*, 58 B.R. 368, 371 (Bankr.W. D.La.1986)). In order to make such a determination Chief Bankruptcy Judge Martin V.B. Bostetter has stated that "[r]ecords are adequate when they are kept so as to reflect, with a fair degree of accuracy, the debtor's financial conditions and in a manner appropriate to his business." *In re Kim* at 279.

The major contention of the plaintiffs under this section is that Jacobe caused Southeast to fail to keep adequate records of the landlord start up payments received and expenditures made with respect to the individual stores opened by the company. The Court does not disagree with the argument of plaintiffs' counsel that a debtor's financial information should be reasonably accessible. And, of course, there have to be limits on the amount of effort required of creditors to extract necessary financial information from a debtor. However, the Court must observe here that the creditors or their representatives scarcely went to extraordinary lengths to obtain the information which was sought.

The Court's findings of fact concerning Southeast's accounting records make it clear that the plaintiffs have not made their case against Jacobe under this subsection. "The purpose of § 727(a)(3) is to make the privilege of discharge dependent upon a true presentation of the debtor's financial affairs." *In re Baxter* at 60. There has been no evidence that Jacobe gave a false presentation of financial affairs, nor that Southeast's records were purposely maintained in a manner to conceal individual store start up receipts and expenditures. Certainly Southeast's financial records were not of the highest quality. However, with some effort the information was available in Southeast's books. The fact that the books were not kept in the specific manner that the plaintiffs requested is not a sufficient reason to deny discharge under § 727(a)(3).

Section 727(a)(5).

■ At heart of the plaintiffs' case is the undisputed fact that in the relatively short period of Southeast's existence, the corporation received in excess of $7,000,000.00 from its landlords as start up payments for individual stores and that these funds were used as needed in the company's general operation.

The issue under § 727(a)(5) is whether Southeast's failure to allocate the landlord receipts to the individual stores constituted a failure by Southeast or Jacobe to "explain satisfactorily" a loss or deficiency of assets. *See* 11 U.S.C. § 727(a)(5) (1988).

Jacobe freely acknowledged Southeast's use of the landlord revenues for general operating purposes. His testimony is that Southeast's policy of so using the funds was contemplated by the lease agreements and accepted by the landlords. Prior to the filing of the instant adversary proceeding, no landlord had ever questioned Southeast's use of their funds.

In the Court's view, the plaintiffs' case was considerably weakened by the withdrawal of several plaintiffs just prior to trial and by the consequent lack of significant testimony to dispute Jacobe's evidence on the use of the landlord revenues.

Of the three plaintiffs who remain in the case, only Pinnacle Point produced a witness. His testimony revealed that the start up payments were to be available to cover operational expenses for the stores. He stated that he knew all payments by Pinnacle Point were not going to start up or "build out" for individual stores. The strongest statement of the witness in opposition to Jacobe's testimony was that the payments for one store were not to be used by Southeast for other stores.

Perhaps the most ironic evidence presented at trial is that concerning the leases of the other remaining plaintiffs, Haywood Properties, Ltd., and The Centre At Westgate, Ltd.[5] Originally these leases did provide specific language restricting tenant use of the start up payments. However, at

---

**5.** The language of the original and the revised lease provisions for start up payments of these

plaintiffs is set out in the facts section of this opinion.

the request of a representative of the landlords, these restrictive provisions were completely eliminated. Thus these leases contain no restrictions on Southeast's use of the start up payments and are subject to the broad interpretation of the instruments assumed by Southeast. Perhaps understandably, no witness appeared at trial for either of these parties.

While it is uncontroverted that the losses occurred, the Court concludes that the leases did not restrict the use of the landlords' contributions. Consequently, the evidence concerning landlord payments to Southeast does not satisfy the plaintiff's initial burden or proof and is not sufficient to deny Jacobe's discharge under § 727(a)(5).

In addition to their position on Southeast's failure to account for landlord start up revenues, plaintiffs argue that Jacobe personally received funds from Southeast for which he has failed to account. The principal evidence upon which this argument rests is that Jacobe received a cash advance from the company for travel to Hong Kong for which he never filed an expense account.

It has been previously established that the plaintiffs have the burden of proof by a preponderance of the evidence. Additionally, however, once the plaintiff establishes a prima facie case, the debtor must then present his own evidence "to explain satisfactorily" the losses or deficiencies. *In re Kim* at 284 (citing *In re Chalik*, 748 F.2d 616, 619 (11th Cir.1984); *Matter of Reed*, 700 F.2d 986, 992 (5th Cir.1983); *Lowe's of Va., Inc.*, 60 B.R. 418, 422 (W.D.Va.1986); *In re Belk*, 44 B.R. 793, 794 (Bankr.S.D. Fla.1984)). The appropriate standard for the Court to use when evaluating the debtor's explanation is one of reasonableness or credibility. *See Taylor v. Lineberry (In re Lineberry)*, 55 B.R. 510, 513 (Bankr.W.D. Ky.1985); *Federal Deposit Insurance Corp. v. Hendren (In re Hendren)*, 51 B.R. 781, 788 (Bankr.E.D.Tenn.1985).

Jacobe testified that all of these funds were expended on company business and that he relied upon his secretary to prepare expense reports. While it is true that the evidence surrounding this transaction reveals that Jacobe failed to keep proper records of travel expenses and other rather insubstantial cash withdrawals, Jacobe has explained to the Court's satisfaction that he used all unaccounted money for expenses. Jacobe took no cash payments from Southeast to which he was not entitled as an employee or officer.

The Court concludes that the plaintiffs' charges under § 727(a)(5) must fail.

A separate order will be entered rendering judgment for the defendant.